

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
05/06/2021

| | | |
|---|---|---|
| **IN RE:** | § | |
| **SANCHEZ ENERGY CORPORATION,** *et* | § | **CASE NO: 19-34508** |
| *al,* | § | |
| Debtors. | § | **CHAPTER 11** |
| | § | |
| **OCCIDENTAL PETROLEUM CORP.,** *et al,* | § | |
| Plaintiffs, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 20-3198** |
| | § | |
| **SANCHEZ ENERGY CORPORATION,** *et* | § | |
| *al,* | § | |
| Defendants. | § | |

<u>**MEMORANDUM OPINION**</u>

As oil and gas prices collapsed during the early months of the global COVID-19 pandemic, Sanchez Energy Corporation ("Sanchez") faced a possible conversion of its chapter 11 bankruptcy case to one under chapter 7. To forestall liquidation, Sanchez and its creditors agreed to confirm a chapter 11 plan first and litigate Sanchez's ability to reject executory contracts later. The executory contracts at issue in this opinion concern Sanchez's 2017 purchase of oil and gas assets in Texas' Comanche Field. Occidental Petroleum Corp. ("Occidental"), whose predecessor sold the Comanche Assets, objects to the proposed rejection of its midstream gathering agreements and an associated development agreement. For the reasons that follow, the reorganized debtor, Mesquite Energy, Inc. ("Mesquite"), may reject these executory contracts. However, consistent with the Supreme Court's holding in *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019), Occidental retains its real property interests that were granted in the gathering agreements.

# BACKGROUND

Mesquite seeks authority to reject contracts executed in conjunction with SN Maverick's ("Maverick") purchase of oil and gas assets in the west Texas Eagle Ford Shale. In 2017, Maverick, along with Gavilan Resources, LLC and SN EF UnSub, LP ("UnSub") purchased assets in the Comanche Field (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko").[1] The three purchasers paid $2 billion to acquire separate working interests in about 318,000 acres of the Comanche Assets from Anadarko. To effectuate the transaction, the purchasers, as well as Anadarko, entered into a web of contracts setting forth the parties' rights and obligations with respect to the Comanche Assets.

Prior to the sale, Anadarko's subsidiary built an extensive midstream oil and gas gathering system to transport production from the Comanche Assets downstream. Springfield Pipeline, LLC ("Springfield") spent over $1.3 billion to build the oil and gas gathering systems (the "Springfield Gathering System") servicing the Comanche Assets. Springfield was wholly owned by Anadarko. As part of the Comanche Transaction, Anadarko retained ownership of Springfield and the Springfield Gathering System. The purchasers entered into an Oil Gathering Agreement ("Springfield OGA") and a Gas Gathering Agreement ("Springfield GGA") (collectively, the "Springfield Agreements") which dedicated their hydrocarbon production to the Springfield Gathering System. Additionally, Maverick entered a Development Agreement promising to drill annual quotas of new wells or else pay set fees to Anadarko. Mesquite seeks rejection of the Springfield Agreements and the Development Agreement.

---

[1] Occidental acquired Anadarko in August 2019.

a. *Sanchez Purchases the Comanche Assets*

The Eagle Ford is a shale play in south Texas. As early as 2008, Anadarko began to acquire oil and gas assets in the Eagle Ford shale, including assets in the Comanche Field. (ECF No. 50 at 17). At about the same time, Anadarko acquired Springfield and contracted with Springfield to build the Springfield Gathering System. (ECF No. 50 at 18). The Springfield Gathering System now consists of over 750 miles of pipeline connecting wells in the Comanche Field to centralized processing plants. (ECF No. 50 at 18). Springfield spent over $1.3 billion to construct and maintain the Springfield Gathering System. (ECF No. 50 at 18).

Prior to the sale of the Comanche Assets, in 2011, Anadarko entered into certain oil and gas gathering agreements with Springfield ("Original Springfield Agreements"). (ECF No. 50 at 19). "The Original Springfield Agreements contain dedications and long-term commitments in consideration of the substantial capital invested in the Springfield Gathering System." (ECF No. 50 at 19).

In 2017, Sanchez, through its affiliate SN EF Maverick, LLC ("Maverick"), along with UnSub and Gavilan purchased the majority of Anadarko's working interests in the Comanche Field. (ECF No. 50 at 20). The parties entered into a Purchase and Sale Agreement ("PSA") on January 12, 2017. (ECF No. 50 at 20). The purchasers "acquired the majority of Anadarko's working interest in the Comanche Leases and related assets, granting the right to explore for and produce hydrocarbons, primarily targeting the Eagle Ford shale, on approximately 320,000 gross acres located in Dimmit, La Salle, Maverick, Webb, and Zavala Counties." (Case No. 20-3198; ECF No. 50 at 20). The sale closed on March 1, 2017.

## Retained Agreements

While the purchasers sought to buy all of Anadarko's assets, a number of Anadarko's lease counterparties refused to consent to the sale.  (ECF No. 50 at 22).  "The parties solved for this in the PSA by having Anadarko retain certain Comanche Leases . . . and entering into a joint operating agreement ["JOA"] appointing SN Maverick as operator."  (ECF No. 50 at 23).  Thus, Anadarko continued to hold title to those leases, but did so for the benefit of the purchasers.  (ECF No. 50 at 23).  Under the Retained Agreements, Anadarko was required to deliver minimum volume commitments to midstream gatherers or else pay significant fees.  (ECF No. 1 at 3).

## Springfield Agreements

Anadarko did not sell Springfield or the Springfield Gathering System as part of the Comanche Transaction.  Instead, on June 1, 2017, Sanchez and Anadarko entered into the "Springfield Gathering Assumption Agreement," which assigned the Original Springfield Agreements to Sanchez.  (ECF No. 50 at 23).  On the same date, Springfield and Sanchez entered into the Springfield OGA and the Springfield GGA.  (ECF No. 50 at 23).  The Springfield Agreements include dedications of oil and gas which provide that:

> [Sanchez] dedicates, covenants and commits to the System and performance of this Agreement (a) the Leases (including all unproduced Gas that is attributable to the Leases), (b) all Wells other than the Excluded Wells and (c) the Dedicated Production.  [Sanchez] acknowledges and agrees that the dedication, covenants and commitments set forth . . . under this Agreement are continuations of the dedication, covenants and commitments made by [Anadarko] in the [Original Springfield Agreements] (the "Prior Dedication"), to the extent (and only to the extent) that [Anadarko] assigned Original [Springfield] Agreement[s] to [Sanchez], and that the Prior Dedication has not been terminated or interrupted in any way by the entry into this agreement.

(ECF No. 50 at 24-25).  The Springfield Agreements express an intent to form covenants running with the land:

> Each Party agrees that the dedication, covenants and commitments set forth in this Section 2 or in any other section under this Agreement are equitable servitudes and covenants running with the land with respect to (a) the Leases (including all unproduced Gas [or Oil] that is attributable to the Leases), (b) all Wells other than the Excluded Wells and (c) the Dedicated Production, and shall be binding on [Sanchez], [Sanchez's] Affiliates, and the successors and permitted assigns of [Sanchez] and [Sanchez's] Affiliates.

(ECF No. 50 at 25).   The aforementioned "dedications, covenants and commitments" include "[Sanchez] and its Affiliates' right, title, and interest in and to (a) the Leases (including all unproduced Gas that is attributable to the Leases), (b) all Wells other than the Excluded Wells and (c) the Dedicated Production."  (ECF No. 50 at 25).  In addition to the dedication, the Springfield Agreements conveyed a floating easement and right-of-way to Springfield in order to lay pipeline, maintain pipeline, and install other necessary equipment.  (ECF No. 50 at 20).

Antonio R. Sanchez III ("Mr. Sanchez") signed the Springfield Agreements on behalf of Sanchez after Anadarko expressed concerns about Maverick's credit rating.  (ECF No. 50 at 24). As previously explained, Maverick was a wholly owned subsidiary of Sanchez.  At the time of the Comanche Transaction, Mr. Sanchez served as CEO of both Sanchez and Maverick.  Mr. Sanchez signed numerous Comanche Agreements on behalf of Sanchez, Maverick, or both.  (ECF No. 50 at 22).

Development Agreement

On March 1, 2017, Maverick, UnSub, Gavilan, and Anadarko entered into the Development Agreement.  (ECF No. 50 at 26).  The Development Agreement requires Maverick, UnSub, and Gavilan to either complete and equip sixty wells per year over a five-year period or pay Anadarko a $200,000.00 fee for each promised but uncompleted well.  (ECF No. 50 at 26). Section 2.1 of the Development Agreement states that the purchasers "commit to Complete and Equip sixty (60) gross wells per Twelve Month Period on the lands covered by or unitized with

the Leases."   (ECF No. 58-3 at 6).  Sanchez guaranteed Maverick's obligations under the Development Agreement.  (ECF No. 50 at 26).

Like the Springfield Agreements, the Development Agreement expresses the parties' intent that it form covenants running with the land, stating:

> ***Covenants Running with Lands.***  The obligations of the Drilling Parties under this Agreement are partial consideration for Anadarko's conveyance of the Assets to the Drilling Parties under the Assignments, and such obligations touch and concern the Leases and lands and obligations related thereto, being things in existence, and shall be covenants running with the land.  Such obligations shall burden each Drilling Party's interest, and the interest of any permitted successor or assign of such Drilling Party, in and to the Leases and the lands related thereto, for the benefit of Anadarko.

(ECF No. 50 at 27).

The Development Agreement terminates after five years, so long as either all three-hundred promised wells have been completed or all outstanding fees have been paid to Anadarko.  (ECF No. 44 at 17).  Under the Development Agreement, failure to drill and complete the promised wells is considered a default.  (ECF No. 58-3 at 8).  As a result of any default, the purchasers agreed to pay Anadarko $200,000.00 per promised but uncompleted well.  (ECF No. 58-3 at 8 ("If, during any Twelve Month Period, the Drilling Parties fail to Complete and Equip all sixty (60) of the Commitment Wells required for such Twelve Month Period, as contemplated by Section 2.1, the Drilling Parties will be obligated, jointly and severally, to pay AEP an amount equal to (a) sixty (60) minus the number of Commitment Wells that the Drilling Parties Completed and Equipped during such Twelve Month Period, multiplied by (b) two hundred thousand dollars ($200,000)." (emphasis omitted))).

Anadarko may not compel the purchasers to drill wells under the Development Agreement.  (ECF No. 58-3 at 8 ("Anadarko acknowledges and agrees that recovery of the Default Fee for each

Twelve Month Period shall be Anadarko's sole and exclusive remedy for failure by the Drilling Parties to satisfy the Drilling Commitment . . . .")).

   b.   *The Sanchez Bankruptcy Case*

Sanchez and its affiliates filed voluntary petitions under chapter 11 of the Bankruptcy Code on August 11, 2019.[2]  (Case No. 19-34508; ECF No. 1).  Sanchez filed its "Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy and Its Debtor Affiliates" on April 30, 2020. (Case No. 19-34508; ECF No. 1198).   Under the Plan, certain pre-petition senior secured noteholders who provided debtor-in-possession financing (the "DIP Lenders") would take ownership of the reorganized debtors.  When the Plan was filed, the DIP Lenders threatened to seek conversion to chapter 7 because of an alleged default under the DIP loan.  As a result, Sanchez sought an expedited confirmation hearing to be held on April 30, 2020.  The Court held the confirmation hearing, approved the Plan, and entered an "Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates" ("Confirmation Order") on that same date.  (Case No. 19-34508; ECF No. 1212).  The Plan became effective two months later on June 30, 2020.  (Case No. 19-34508; ECF No. 1417 at 1).

The Plan established a post-effective date deadline for parties to object to Sanchez and Mesquite's proposed assumption or rejection of executory contracts.  (*See* Case No. 19-34508; ECF No. 1212 at 10).   Executory contracts whose treatment was not objected to were deemed assumed or rejected, in accordance with Sanchez's assumption and rejection schedules, as of the

---

[2] The Debtors in the chapter 11 cases were Sanchez Energy Corporation; SN Palmetto, LLC; SN Marquis, LLC; SN Cotulla Assets, LLC; SN Operating, LLC; SN TMS, LLC; SN Catarina, LLC; Rockin L Ranch Company, LLC; SN EF Maverick, LLC; SN Payables, LLC; and SN UR Holdings, LLC.

Effective Date of the Plan.  The treatment of executory contracts subject to a timely objection would be decided by the Court after the Effective Date.

Counterparties' rights and defenses to assumption or rejection were expressly preserved under the Confirmation Order.  The Confirmation Order states that:

> Notwithstanding any other provision in this Confirmation Order or the Plan to the contrary, nothing in this Confirmation Order or the Plan (and neither the confirmation nor consummation of the Plan) shall eliminate, alter or impair (or otherwise prevent any Counterparty (as defined below) from asserting), any or all of the Counterparties' respective defenses, arguments or appellate rights to the extent relating to (a) any proposed assumption or rejection of any Executory Contract or Unexpired Lease with such Counterparty or real property interests of such Counterparty (including rights, defenses, or arguments that such agreements or interests, as applicable, constitute covenants running with the land not subject to assumption or rejection, do not constitute Executory Contracts or Unexpired Leases under the Bankruptcy Code and the terms of the Plan, or are not otherwise subject to assumption or rejection) . . . provided that each Counterparty shall be required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to the Contract Objection Deadline.

(Case No. 19-34508; ECF No. 1212 at 13-14).

Sanchez filed its rejection schedule on April 29, 2020, which proposed rejecting various Comanche Agreements.  (*See* Case No. 19-34508; ECF No. 1197).  Mesquite later amended the rejection schedule.  Relevant to this dispute, Sanchez proposed rejection of the Springfield Agreements and the Development Agreement.

### c.  *Occidental Objects to Rejection*

Occidental, Anadarko's successor-in-interest, filed its objection to rejection and a complaint commencing this adversary proceeding on June 22, 2020.[3]  (Case No. 19-34508; ECF No. 1355).  Occidental's complaint seeks "declarations that the Springfield Agreements and the

---

[3] The plaintiffs in Adversary No. 20-3198 are Occidental Petroleum Corporation; Anadarko Petroleum Corporation; Anadarko E&P Onshore LLC; Anadarko Energy Services Company; Kerr-McGee Oil & Gas Onshore LP; Western Midstream Partners LP; WGR Operating, LP; and Springfield Pipeline, LLC.  (ECF No. 1).

[Development Agreement] are covenants running with the land and equitable servitudes that cannot be rejected."  (ECF No. 50 at 33).  Both Occidental and Mesquite moved for summary judgment and the Court took the matters under advisement.  (ECF Nos. 50, 57).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  A determination of a debtor's ability to assume or reject executory contracts is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this District consistent with 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).  A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party.  *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times.  *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).  Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence.  *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012).  "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence."  *Hemphill v.*

*State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact.  FED. R. CIV. P. 56(c)(1).  The Court need consider only the cited materials, but it may consider other materials in the record.  FED. R. CIV. P. 56(c)(3).  The Court should not weigh the evidence.  *Wheat v. Fla Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016).  A credibility determination may not be part of the summary judgment analysis.  *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).  However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  FED. R. CIV. P. 56(c)(2).  Moreover, the Court is not bound to search the record for the non-moving party's evidence of material issues.  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the [] court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).  The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).  Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact.  FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322–24.  The non-moving party must cite to specific evidence demonstrating a genuine dispute.  FED. R. CIV. P.

56(c)(1); *Celotex*, 477 U.S. at 324.  The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  Even if the movant meets its initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

### DISCUSSION

As part of the Comanche Transaction, Sanchez entered into the Springfield Agreements, which dedicated the production from the Comanche Assets to the Springfield Gathering System. Maverick promised under the Development Agreement to drill a specified number of wells on the Comanche Assets each year or else pay a default fee.  Mesquite now asks the Court to approve rejection of those executory contracts.  The Court will do so.  However, the Springfield Agreements formed covenants running with the land which are not terminated by rejection. Further, Occidental waived its argument that Mesquite cannot exercise rejection rights under § 365 after the Effective Date of the Plan because Occidental expressly assented to the rejection procedure in this case.

### a.  Occidental Cannot Collaterally Attack the Plan

Before deciding whether rejection of the Comanche Agreements is appropriate, Occidental argues that post-effective date rejection is barred by the text of the Bankruptcy Code.  The Sanchez Plan and Confirmation Order included a procedure to resolve rejection disputes after the Effective Date.  Occidental claims that the Bankruptcy Code grants the power to assume or reject executory contracts to the trustee or debtor-in-possession, not with a reorganized debtor.  Because it believes that post-effective date rejection involves a reorganized debtor exercising rejection power, Occidental believes such a procedure runs afoul of the Bankruptcy Code.  However, Occidental assented to this procedure at confirmation and failed to appeal the Confirmation Order.  For those

reasons, Occidental's argument against post-effective date rejection amounts to a collateral attack on the procedure set out in Sanchez's Plan. Occidental waived that argument in this case.

The Supreme Court has held that a confirmed plan may bind parties in interest even if a plan provision contravenes the Bankruptcy Code. In *United Student Aid Funds, Inc. v. Espinosa*, a bankruptcy court confirmed a chapter 13 plan which improperly discharged a portion of the debtor's student loan debt. 559 U.S. 260 (2010). Like Occidental, the creditor received notice of the plan, but did not object to or appeal confirmation. Although the bankruptcy court confirmed the plan in error, the Supreme Court found that the confirmation order was "enforceable and binding on [the creditor] because [the creditor] had notice of the error and failed to object or timely appeal." *Id.* at 275.

*Espinosa* makes clear that parties and the Court must adhere to the terms of a confirmed plan. This is so even if the Court committed a legal error by confirming the plan. *Id.*; *see also* (Case No. 20-3198; ECF No. 74 at 49 ("We either did it in the plan or we didn't in terms of deciding whether this procedure was legal. If we decided that the procedure was legal and you didn't appeal it, I think you're too late.")). The Court is not convinced that confirmation of the Sanchez Plan was erroneous. However, even if the Court made a legal error, that error did not deprive Occidental of due process or exceed the Court's subject matter jurisdiction. *See Espinosa*, 559 U.S. at 271. On the contrary, Occidental has received the benefits of the Springfield Agreements and Development Agreement during the interim period following confirmation.

Occidental points to the Confirmation Order's preservation of rights concerning defenses to rejection as evidence that it did not waive its argument. Occidental misconstrues that provision of the Confirmation Order. The Sanchez Plan set out a procedure to resolve rejection disputes after the Plan became effective. Occidental assented to that procedure before the Court, did not

object to confirmation, and did not appeal the Confirmation Order.  In exchange, the Confirmation

Order preserved all of Occidental's defenses and arguments against rejection of its executory

contracts with Sanchez.  This ensured that Occidental could assert all of the arguments against

rejection post-effective date as Occidental could have asserted before confirmation.  Occidental

cannot use that preservation provision of the Confirmation Order as a basis to retroactively attack

the Plan's rejection procedure.  A procedure which Occidental explicitly assented to.

In April 2020, Occidental filed a limited objection to confirmation.  (Case No. 19-34508;

ECF No. 1164).  Paragraph 3 of that limited objection stated that:

> the Debtors have adopted an unorthodox approach to assumption and rejection
> disputes: the Plan contemplates that all assumption and rejection objections will not
> be resolved until well after the Effective Date . . . . Under the circumstances of these
> cases (and the macro-economic issues impacting the Debtors), *the [Occidental]*
> *Parties do not object to that general approach, so long as their rights with respect*
> *to those assumption and rejection disputes are fully preserved*.

(Case No. 19-34508; ECF No. 1164 at 2 (emphasis added)).  In that objection, Occidental expressly

assented to the "general approach" to rejection set out in the Plan, so long as Occidental was not

prejudiced by that procedure.  The objection led to the inclusion of the preservation of rights

provision in the Confirmation Order.  That provision, found in Paragraph 23 of the Confirmation

Order, reads as follows:

> Notwithstanding any other provision in this Confirmation Order or the Plan to the
> contrary, nothing in this Confirmation Order or the Plan (and neither the
> confirmation nor the consummation of the Plan) shall eliminate, alter or impair (or
> otherwise prevent any Counterparty . . . from asserting), any or all of the
> Counterparties' respective defenses, arguments or appellate rights to the extent
> relating to (a) any proposed assumption or rejection of any Executory Contract or
> Unexpired Lease with such Counterparty or real property interests of such
> Counterparty (including rights, defenses, or arguments that such agreements or
> interests, as applicable, constitute covenants running with the land not subject to
> rejection, do not constitute Executory Contracts or Unexpired Leases under the
> Bankruptcy Code and the terms of the Plan, or are not otherwise subject to
> assumption or rejection) and (b) the vesting of any property in the Reorganized

> Debtors free and clear of any real property interests of such Counterparty . . . ; *provided* that each Counterparty shall be required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to the Contract Objection Deadline.

(Case No. 19-34508; ECF No. 1212 at 13-14).   The Confirmation Order preserves Occidental's "defenses, arguments, or appellate rights" related to assumption or rejection.   Further, the Confirmation Order specifically states that arguments relating to whether executory contracts contain covenants running with the land are preserved.

Despite assenting to the approach, Occidental now contends that the procedure is invalid under the Bankruptcy Code and that rejection of the Comanche Agreements is no longer possible.   Occidental claims that the Confirmation Order preserved this argument.   While the language of the preservation provision is broad, Paragraph 23 did not preserve that argument.   Occidental's contention is directly contrary to representations it made to Sanchez and to this Court at the confirmation hearing.   All parties relied on those representations.

Upending the Plan's rejection procedure at this late stage would be fundamentally unfair to Mesquite.   Nothing in the Plan or the Confirmation Order, nor any statement on the record at the confirmation hearing, suggested that Sanchez or Mesquite might forfeit the right to assume or reject contracts by undertaking this procedure.   Occidental raised concerns about a reorganized debtor's authority under the Bankruptcy Code to reject executory contracts, yet voluntarily assented to the procedure.   Allowing Occidental to change course now would functionally strip Sanchez and Mesquite of the power to assume or reject executory contracts.

"An Order confirming a plan of reorganization is entitled to res judicata effect."   *In re Wildwood Prop. Owners Ass'n*, 2017 WL 3189874, at *7 (Bankr. S.D. Tex. July 25, 2017) (citing *Stoll v. Gottlieb*, 305 U.S. 165, 170-71 (1938)).   "Federal courts have consistently applied res

judicata principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order." *Id.* Res judicata bars Occidental from attacking the Plan's rejection procedure post-confirmation. The preservation provision of the Confirmation Order preserved Occidental's defenses to rejection of its contracts with Sanchez. The Plan and Confirmation Order established the rejection procedure. Occidental may challenge whether rejection of its contracts with Sanchez is appropriate, but it is estopped from attacking the rejection procedure.

> b. *Mesquite May Reject Executory Contracts Containing Covenants Running with the Land*

Much of the briefing in this adversary proceeding focuses on whether the Springfield Agreements and Development Agreement contain covenants running with the land. The parties' focus on the presence of real property covenants is understandable given this Court's recent holding in *In re Alta Mesa Resources, Inc*, 613 B.R. 90 (Bankr. S.D. Tex. 2019). There, the Court stated that "[r]eal property covenants are not executory and are not subject to rejection." *Id.* at 98. That point of the *Alta Mesa* decision could lead one to believe that a debtor cannot reject an executory contract which creates a real property covenant. Although real property covenants are not terminated by rejection, the existence of a real property covenant does not prevent a debtor from rejecting its executory obligations in a contract. *See Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019); *In re Extraction Oil & Gas*, 622 B.R. 608, 620 n.34 (Bankr. D. Del. 2020).

Section 365 of the Bankruptcy Code allows a debtor-in-possession, subject to court approval, to "assume or reject *any* executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (emphasis added). "A contract is executory if 'performance remains due to some extent on both sides.'" *Mission Product*, 139 S. Ct. at 1658 (quoting *NLRB v. Bildisco & Bildisco*, 465

U.S. 513, 522 n.6 (1984)).  "In simple terms, § 365(a) allows a debtor to re-evaluate the wisdom of continued performance of a particular contract based upon the circumstances faced by the debtor during the bankruptcy case."  *In re Chesapeake Energy Corp.*, 622 B.R. 274, 280 (Bankr. S.D. Tex. 2020).  A debtor's rejection decision is evaluated using the business judgment rule.  *Mission Product*, 139 S. Ct. at 1658.

In *Mission Product*, the Supreme Court explained that rejection "breaches a contract, but does not rescind it.  And that means all the rights that would ordinarily survive a contract breach . . . remain in place."  *Id.*; *see also* 11 U.S.C. § 365(g).  Rejection mirrors a breach of contract outside of bankruptcy.  This means that, post-rejection, a counterparty retains those contract rights that would survive a breach under applicable non-bankruptcy law.  When an executory contract contains a real property covenant, "the appropriate analysis is" to determine "what benefit was previously bestowed by the debtor on the non-rejecting party that remains post-rejection and what future performance by the debtor is excused by the rejection."  *In re Chesapeake Energy Corp.*, 622 B.R. at 281.

When a party executes a contract granting a real property covenant, the party conveys one or more of its real property rights.  The party's proverbial 'bundle of sticks' is diminished.  Because real property covenants "are so connected to the underlying land that the benefit and burden pass to successors by operation of law," real property covenants are not terminated by a party's breach of contract.  *In re Alta Mesa Resources, Inc.*, 613 B.R. at 100 (citing *Beattie v. State ex rel. Grand River Dam Auth.*, 41 P.3d 377, 386 (Okla. 2002)).  A party who conveys a real property covenant does not recover the transferred property rights by merely breaching the contract.  Likewise, when that party rejects the contract under § 365, those rights remain with the non-rejecting party.  Thus,

real property covenants provide an example of a contract right that survives rejection. *See Mission Product*, 139 S. Ct. at 1658.

However, the presence of a real property covenant does not hinder a debtor's right to reject its future performance duties under an executory contract. Nothing prevents a contract from forming a real property covenant while still being executory (having material performance remaining on both sides). *In re Chesapeake Energy Corp.*, 622 B.R. at 281 ("Likewise, § 365 of the Bankruptcy Code contains no such exclusion and no known rule or law prohibits the mutual existence of both concepts within a single document."). Congress granted debtors the expansive right to reject *any* executory contract. 11 U.S.C. § 365(a). The existence of a real property covenant does not limit the rejection power that Congress granted to debtors. If a contract is executory, a debtor may seek rejection.

Real property covenants are clear examples of rights that are not terminated by a breach of contract. A given contract could convey countless other rights that might survive rejection consistent with *Mission Product*. The inquiry must be made on a case-by-case and contract-by-contract basis. Rejection of the Springfield Agreements and Development Agreement alleviates Mesquite's burdens under those contracts. Rejection does not strip Occidental of rights that would survive breaches outside of bankruptcy.

### c. *Mesquite May Reject the Springfield Agreements*

Mesquite may reject the Springfield Agreements because both the Springfield OGA and Springfield GGA are executory contracts and Mesquite has shown that rejection satisfies its business judgment. The Springfield Agreements dedicated Sanchez's production from the Comanche Assets, including that of its subsidiary Maverick's, to the Springfield Gathering

System.  The dedications in the Springfield Agreements formed real property covenants which survive rejection.  Rejection does not deprive Occidental of those rights.

### 1.  The Springfield Agreements Dedicated Maverick's Interests

The Springfield Agreements state that Sanchez "hereby grants to [Springfield] such rights as it may have of ingress and egress, the right to lay and maintain pipelines, and to install any other necessary equipment on and across any lands covered by this Agreement."  (ECF No. 58-2 at 43).  Under the PSA, Maverick, Sanchez's wholly owned subsidiary, purchased the Comanche Assets.  Because Maverick purchased the assets, but only its parent company signed the Springfield Agreements, Mesquite argues that Sanchez did not possess any property rights in the Comanche Assets.  Therefore, Mesquite argues that the Springfield Agreements could not have conveyed any property rights to Occidental.  A closer examination of the contracts defeats Mesquite's position.

The Springfield Agreements expressly bind Sanchez's subsidiaries.  The Springfield Agreements state that the "Shipper dedicates, covenants and commits to the [Springfield Gathering] System and  performance of this Agreement (a) the Leases (including all unproduced Oil that is attributable to the Leases), (b) all Wells other than the Excluded Wells and (c) the Dedicated Production."  (ECF No. 58-2 at 5).  Sanchez is the "Shipper" under the Springfield Agreements.  (ECF No. 58-3 at 5).

Sanchez represented in various provisions of the Springfield Agreements that its affiliates were to be bound by the dedications and covenants.  For instance, "Leases" are defined as "Shipper's *or its Affiliates'* right, title and interest in and to any lease . . . ."  (ECF No. 58-2 at 19 (emphasis added)).   "Dedicated Production" is defined as "all Oil now or hereafter owned, controlled or produced by Shipper *or its Affiliates* . . . ."  (ECF No. 58-2 at 18 (emphasis added)).  The Springfield Agreements explicitly state that "[t]he dedication, covenants, and commitments

under this Agreement affect Shipper's *and its Affiliates'* right, title and interest in and to" the Leases, Wells, and Dedication Production.  (ECF No. 58-2 at 6 (emphasis added)).  Finally, the Springfield Agreements make clear that "the dedications, covenants, and commitments . . . are equitable servitudes and covenants running with the land . . . and *shall be binding on* Shipper, [and] *Shipper's Affiliates* . . . ."  (ECF No. 58-2 at 5-6 (emphasis added)).  As a wholly owned subsidiary, there is no question that Maverick was an "Affiliate" under the Springfield Agreements.  (ECF No. 58-2 at 16 (defining "Affiliate" as "any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person")).

Mr. Sanchez had both actual and apparent authority to bind Maverick.  Maverick was a wholly owned subsidiary of Sanchez.  Under Maverick's company agreement, Sanchez had authority to manage Maverick's business and affairs.  (Case No. 19-34508; ECF No. 16).  Mr. Sanchez was an officer of both Sanchez and Maverick.  He signed various Comanche Agreements on behalf of both entities.

A principal is made party to any contract executed on the principal's behalf by an agent acting with actual or apparent authority.  *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007).  Agency theory attributes specific acts to an entity when that entity authorized those acts.  *See Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.3d 1466, 1476-77 (3d Cir. 1988).  Apparent authority is based on estoppel, and "to determine an agent's apparent authority [courts] examine the conduct of the principal and the reasonableness of the third party's assumptions about authority."  *Gaines*, 235 S.W.3d at 183.

The plain language of the Springfield Agreements expresses the parties' intent that both Sanchez and its affiliates would be bound by the Agreements.  Although Mr. Sanchez signed the Springfield Agreements on behalf of Sanchez, the language of the Springfield Agreements shows an intent to bind Sanchez's subsidiaries.  Mr. Sanchez possessed the requisite authority to bind those entities, including Maverick.

Mr. Sanchez also made overt representations to Springfield that Maverick would be bound by the Springfield Agreements.  When the parties negotiated the Springfield Agreements, Springfield expressed concerns about Maverick's creditworthiness.  In response to those concerns, on January 1, 2017, Mr. Sanchez suggested in an email that Sanchez be named the Shipper under the Agreements.  (ECF No. 51-10 at 2 ("As mentioned, what we'd like to discuss is providing Sanchez Energy Corp. (SN) as the shipper and obligor for the contract (as opposed to the wholly-owned subs "SN Maverick" and "SN UnSub"), which along with the advance payment structure we've agreed to will hopefully address credit concerns for WES.")).  In that same email, Mr. Sanchez represented that Sanchez "will control/market the production of its operating subs (SN UnSub and SN Maverick)," and that "[a]ll of the properties will be expressly dedicated and committed to the gathering contracts pursuant to . . . the agreements, *which includes the dedication of Sanchez's and any of its affiliates interest in wells and leases*."  (ECF No. 51-10 at 2 (emphasis added)).

Both the language of the Springfield Agreements and the representations made by Mr. Sanchez during negotiations leave no doubt that Springfield reasonably believed Maverick was bound by the Agreements.  The Springfield Agreements say so.  Maverick's own CEO said so. Mesquite's argument that Sanchez had no property interests to dedicate runs contrary to the summary judgment evidence.    The argument would render the Springfield Agreements

meaningless.  Mesquite asks the Court to find that Sanchez's promise to ship production along the Springfield Gathering System, a key aspect of a multi-billion dollar oil and gas transaction, was entirely illusory.  Mesquite's argument ignores the evidence and equities of this case.  This was not sloppiness or oversight by Springfield.  Mr. Sanchez's January 1, 2017 email clearly indicated that Sanchez would be named Shipper to address credit concerns, but Maverick's interests would be dedicated.  The Agreements explicitly bind Sanchez affiliates, including Maverick.  Mesquite cannot escape Mr. Sanchez's promise to Springfield that Maverick's interests in the Comanche Assets would be bound by the Springfield Agreements.

### 2.   *Mesquite May Reject the Springfield Agreements*

The Springfield Agreements dedicate Sanchez and Maverick's interests in Comanche leases, wells, and production to the Springfield Gathering System.   Neither Mesquite nor Occidental disputes that the Springfield Agreements are executory contracts.  The Agreements required Springfield to provide gathering services for Sanchez's production from the Comanche Assets.  The Agreements required Sanchez to pay Springfield for those services.  Additionally, Sanchez was required to delivery its dedicated production to receipt points, to provide Springfield with quarterly reports of wells that Sanchez planned to drill, and to connect future wells to future receipt points.  (ECF No. 58-2 at 23, 26).  Those obligations were material and ongoing for the duration of the Springfield Agreements' terms.

Rejection of the Springfield Agreements satisfies the business judgment rule.  Mesquite attests that the Springfield Agreements require it to pay above market rates to ship its oil and gas production.  Occidental does not contest that point.  Allowing debtors to escape unmarketable contracts is a primary aim of the rejection power.  *See Mission Product*, 139 S. Ct. at 1658 ("Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to decide whether

the contract is a good deal for the estate going forward."). Under the business judgment rule, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr D. Del. 2001) (quoting *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987). Mesquite's decision to reject the Springfield Agreements, presumably with the goal of negotiating more favorable gathering terms with Springfield, is a reasonable exercise of its business judgment. As the Court will explain shortly, the Springfield Agreements include real property covenants that are not terminated by rejection. The survival of those covenants does not negate Mesquite's business judgment. Rejection of the Springfield Agreements may still benefit the estate by removing some of Mesquite's burdens and opening the door to re-negotiation. Thus, the Court approves Mesquite's rejection of the Springfield OGA and Springfield GGA.

### 3. *The Springfield Agreements Formed Real Property Covenants*

Mesquite may reject the Springfield Agreements, but certain rights remain with Occidental notwithstanding rejection. Sanchez's dedications of its oil and gas and grants of surface easements formed real property covenants which survive rejection of the Springfield Agreements. Consistent with *Mission Product* and Texas law, those property rights remain with Occidental.

The Comanche Assets reside in Texas and Texas real property law controls. In Texas, a covenant runs with the land when: (i) the obligation touches and concerns the land; (ii) the obligation relates to a thing in existence, or specifically binds the parties and their assigns; (iii) the original parties intended the covenant to run with the land; and (iv) the successor has notice of the obligation. *In re El Paso Refinery, LP*, 302 F.3d 343, 355 (5th Cir. 2002); *see also In re Alta Mesa*, 613 B.R. at 99-100 (applying Oklahoma law, but commenting that the laws concerning covenants running with the land in Oklahoma and Texas are substantially similar). Privity of estate, also

known as vertical privity, is also necessary.  *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir.

2013).  A handful of courts require that the covenant "must be contained in a grant of land or in a

grant of some property interest in the land."  *Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971,

973 (Tex. App.—Tyler 2013).  "This concept, known as horizontal privity, was criticized by the

Fifth Circuit in *Energytec* as potentially no longer applicable, although the *Energytec* Court

performed the horizontal privity test as part of its analysis."  *In re Chesapeake Energy*, 622 B.R.

at 281).  The formation of real property covenants is disfavored.  *Wilmoth v. Wilcox*, 734 S.W.2d

656, 657 (Tex. 1987).

<u>The Springfield Agreements Touch and Concern the Comanche Leases</u>

The Springfield Agreements touch and concern the Comanche Assets.  The Texas Supreme

Court holds that a covenant touches and concerns the land when it "affect[s] the nature, quality, or

value of the thing demised, independently of collateral circumstances, or if it affect[s] the mode of

enjoying it."  *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910 (Tex. 1982).  Texas

courts often apply a "burden on the promisor's land" test to decide whether a covenant touches

and concerns land.  *Id.* at 910-11.

Maverick acquired title to the Comanche Leases under the PSA.  (*E.g.*, ECF No. 50 at 56

n.82).  By holding legal title to the Comanche Leases, Maverick owns real property interests.  In

Texas, "the lessor [of an oil and gas lease] is a grantor and grants a fee simple determinable interest

to the lessee, who is actually a grantee.  Consequently, the lessee/grantee acquires ownership of

all the minerals in place that the lessor/grantor owned and purported to lease, subject to the

possibility of reverter in the lessor/grantor."  *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d

188, 192 (Tex. 2003).  When a party owns an oil and gas lease, it has the exclusive "right to

possess, use, and dispose of the gas and oil."  *Stephens Cty. v. Mid-Kansas Oil & Gas Co.*, 254

S.W. 290, 292 (Tex. 1923). Leasehold ownership also includes a "right to develop" encompassing "the exclusive right to possess, use and appropriate gas and oil; . . . to appropriate [the minerals] to any extent desired . . . to conduct operations to mine, store, and transport [the minerals]; and . . . to prospect for, produce, and dispose of the minerals." *Lightning Oil Co. v. Anadarko E&P Offshore, LLC*, 520 S.W.3d 39, 49 (Tex. 2017). Accordingly, Texas law grants lessees an implied surface easement "to use as much of the surface as reasonably necessary to produce and remove minerals." *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 60 (Tex. 2016).

The Springfield Agreements affect the nature, quality, and value of Maverick's Comanche Leases. *See Westland Oil*, 637 S.W.2d at 910. As this Court explained in *Alta Mesa*, a dedication of hydrocarbons to a midstream gatherer may benefit and burden an oil and gas leasehold. 613 B.R. at 103. "Once a well is linked to an accessible gathering system, the system not only benefits the produced reserves as they travel towards collection, it enhances the value of unproduced reserves which may be extracted in the future." *Id.* Conversely, gathering agreements that grant a surface easement to the gatherer "directly burden [the lessee's] interest in [oil and gas] reserves because they restrict [the lessee's] use of the surface land for drilling or exploration." *Id.* Additionally, a dedication of substantially all of a lessee's production burdens a lessee's right to build its own gathering system or to seek alternative midstream arrangements. *Id.* Finally, fixed fee gathering arrangements burden leaseholds when market conditions would otherwise allow the lessee to pay lower shipping fees. *Id.* at 104-05.

Each of those points is true with regard to the Springfield Agreements. The Springfield Agreements state that Sanchez "dedicates, covenants and commits to the [Springfield Gathering] System and performance of this Agreement" its leases, wells, and dedicated production. (ECF No. 58-2 at 5). Each Agreement goes on to further state that, "[t]he dedications, covenants, and

commitments under this Agreement affect Shipper's and its Affiliates' right, title and interest in and to" the leases, wells, and dedicated production. (ECF No. 58-2 at 6). The Springfield Agreements benefited Sanchez and Maverick's interests because the Agreements ensured Sanchez's access to a readily available gathering system. Without such access, the transportation costs for Sanchez's hydrocarbons would likely increase. *See Alta Mesa*, 613 B.R. at 104.

On the other hand, the Springfield Agreements also burden the Comanche Leases. Like *Alta Mesa*, the Springfield Agreements grant Springfield "such rights as [Sanchez] may have of ingress and egress, the right to lay and maintain pipelines, and to install any other necessary equipment on and across any lands covered by [the] Agreement[s]." (ECF No. 58-2). That provision carves out a portion of Sanchez's implied surface easement and grants that property right to Springfield. *See Alta Mesa*, 613 B.R. at 104. Again, like *Alta Mesa*, the dedication of Sanchez's production to the Springfield Gathering System restricted Sanchez's use of its reserves. 613 B.R. at 103 ("By dedicating nearly all of its production to Kingfisher, Alta Mesa also burdened its interests under the oil and gas leases by restricting its right to seek a different gatherer or build its own gathering system."). Finally, the fee structure found in the Springfield Agreements burdens the Comanche Leases when market midstream shipping rates fall below a certain threshold. *See id.* at 104-05. Because they both benefit and burden Sanchez's real property interests, the Springfield Agreements touch and concern the Comanche Leases.

<u>The Obligations Relate to a Thing in Existence and Bind Successors and Assigns</u>

The Springfield Agreements relate to a thing in existence and expressly bind successors and assigns. The second element necessary to form a real property covenant is satisfied if either the covenant relates to a "thing in existence" or specifically binds successors and assigns. *In re Enrergytec*, 739 F.3d at 221. Sanchez and Maverick's interests in the Comanche Leases were

undoubtedly things in existence.  Further, the Springfield Agreements specifically state that they

bind successors and assigns.  (ECF No. 58-2 at 5-6).  There is no question that the Springfield

Agreements satisfy the second element.

<u>The Parties Intended the Covenants to Run with the Land</u>

Just as the parties to the Springfield Agreements intended to bind successors and assigns,

they also expressly intended that the Springfield Agreements would form real property covenants.

Each Springfield Agreement provides that "[e]ach Party agrees that the dedication, covenants and

commitments set forth in this Section 2 or in any other section under this Agreement are equitable

servitudes and covenants running with the land with respect to (a) the Leases . . . , (b) all Wells

other than Excluded Wells and (c) the Dedicated Production."  (ECF No. 58-2 at 5-6).  The

"express, unambiguous language sufficiently 'evidences the intent of the original parties that the

covenant[s] run with the land.'"  *Fort Worth 4th Street Partners, LP v. Chesapeake Energy Corp.*,

882 F.3d 574, 579 (5th Cir. 2018) (quoting *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736

S.W.2d 632, 633 (Tex. 1987)).  The Springfield Agreements satisfy the third element.

<u>Notice of the Covenants</u>

Springfield and Sanchez are the original covenanting parties under the Springfield

Agreements.  Thus, this case does not present a situation where a third-party successor may have

lacked notice of the covenants.  As the original covenanting parties, Springfield and Sanchez had

actual notice of the covenants.  *See Collum v. Neuhoff*, 507 S.W.2d 920, 922 (Tex. Civ. App.—

Dallas 1974).  Because there is no third-party successor, the fourth element is irrelevant in this

case.  *See In re Energytec*, 739 F.3d at 221.

<u>The Springfield Agreements Satisfy Privity</u>

The Springfield Agreements satisfy the privity requirement under Texas law.  There must be privity of estate, also known as vertical privity, between the parties for a covenant to run with the land.  *Westland Oil*, 637 S.W.2d at 910.  Vertical privity means that "there must be a mutual or successive relationship to the same rights of property."  *Id.* at 910-11.  "An easy example of vertical privity is the transfer of a person's fee estate to another."  *In re Chesapeake Energy*, 622 B.R. at 283.  Because Springfield and Sanchez were the original covenanting parties, and there is no present dispute as to whether a subsequent transferee is bound by the Springfield Agreements, vertical privity is satisfied.  *In re Alta Mesa*, 613 B.R. at 105.

The more contentious issue is whether Texas law requires horizontal privity, and if so, whether horizontal privity exists under the Springfield Agreements.  Horizontal privity exists when a covenant is "contained in a grant of the land or in a grant of some property interest in the land."  *Wayne Harwell Props. v. Pan. Am. Logistics Center, Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997).  "[T]here must be 'simultaneous existing interests' or 'mutual privity' between the original parties" for horizontal privity to be present.  *In re Energytec*, 739 F.3d at 222.  The Court shares "the Fifth Circuit's skepticism about whether a horizontal privity requirement remains" under Texas law.  *In re Chesapeake Energy*, 622 B.R. at 284.

In *Energytec*, the Fifth Circuit explained the ambiguity regarding horizontal privity succinctly, stating that:

> Energytec relies strongly on a Texas case addressing horizontal privity, though the opinion does not use that label.  *Wayne Harwell Props. v. Pan. Am. Logistics Center, Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied).  A Restatement describes *Wayne Harwell* as one of a minority of modern cases requiring horizontal privity.  Restatement (Third) of Prop.: Servitudes § 2.4 (2000).  It is a much-criticized doctrine that has been explicitly rejected by this latest Restatement.  *Id.*  The principle rationale for the doctrine was so "that most

covenants intended to run with the land will be created in conveyances." *Id.*   We must also be wary because the cited decision is not one from the Texas Supreme Court.  We are guided but not controlled by that decision when interpreting Texas law.  *Transcont'l Gas Pipeline Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992).

739 F.3d at 222.  The *Energytec* court applied horizontal privity analysis and found privity was satisfied because the alleged covenant was created by agreements which granted a gathering transportation fee and right-of-way to a pipeline purchaser.  *Id.* at 223.  The Fifth Circuit found that both the transportation fee and right-of-way were conveyances of real property sufficient to create horizontal privity.  *Id.*

This Court need not speculate as to whether Texas law requires horizontal privity because the Springfield Agreements satisfy horizontal privity.  The Springfield Agreements include conveyances of real property interests to Springfield.  The Springfield Agreements dedicated Sanchez's "right, title and interest in and to any lease . . . working interest . . . fee right, mineral servitude, license concession or other right covering [oil and gas] . . . along with rights to drill for, produce, control, take-in-kind and dispose of [oil and gas] . . . " to Springfield.  (ECF No. 58-2 at 19-20).  The Springfield Agreements also carved out a portion of Sanchez's implied surface easement and granted it to Springfield.  *See In re Alta Mesa*, 613 B.R. at 106 ("Although less than a fee simple estate, the easements conveyed to Kingfisher a possessory interest in the leasehold estate.  The surface easement is integrally tied to the purpose of an oil and gas lease.  The conveyance of the easements to Kingfisher is enough to show horizontal privity with respect to the gathering agreements.").  Those conveyances of real property interests to Springfield are sufficient to satisfy horizontal privity.  *See In re Energytec*, 739 F.3d at 223 (horizontal privity established despite conveyance of less than a fee simple estate); *Westland Oil*, 637 S.W.2d at 910-11 (privity satisfied by conveyance of interests in oil and gas leases).

####    d.  *Mesquite May Reject the Development Agreement*

Mesquite is entitled to reject the Development Agreement and the Development Agreement did not form a real property covenant.  The parties entered into the Development Agreement to promote "the near-term development of the [Comanche] Assets."   (ECF No. 50 at 64).   The Development Agreement is straightforward, containing only two operative paragraphs.  To ensure that sufficient hydrocarbons travelled along the Springfield Gathering System, the Development Agreement required Maverick to drill and equip sixty wells each year, for five years.  (ECF No. 58-3 at 2).  Failure to do so was a default under the Development Agreement.  In the event of a default, Occidental's exclusive remedy was to receive $200,000.00 for each promised but uncompleted well.

Mesquite seeks to reject the Development Agreement and avoid its obligation to pay for promised but uncompleted wells.  Mesquite's decision is a sound exercise of its business judgment. The Court approves rejection of the Development Agreement.

However, unlike the Springfield Agreements, the Development Agreement did not form any real property covenants.  Nor did the Development Agreement grant Occidental other contractual rights that would survive rejection.  *See Mission Product*, 139 S. Ct. at 1658.

As Chief Judge Jones recently explained in *Chesapeake*:

> Under the [] Agreement, the parties agreed that the exclusive remedy for a breach of the obligation to deliver or purchase a specified quantity of gas is a formulaic monetary payment.  Specific performance, injunctive relief and other equitable remedies are excluded.   Such a remedy is inherently personal in nature and unrelated to any real property interest held by Chesapeake.  This economic provision better expresses the parties' true intent under and the personal nature of their agreement.  The damages limitation along with the acknowledgement that the [] Agreement is a two-party forward contract . . . suggests that the added language that 'the parties intended for the obligation to run with the land' was an ill-conceived attempt to portray the [] Agreement as a horse of a different color.

*In re Chesapeake Energy*, 622 B.R. at 282. *Chesapeake* makes clear that the personal nature of the default fee provision negates the parties expressed intent that the covenants in the Development Agreement would run with the land. Much like the agreement at issue in *Chesapeake*, the Development Agreement states that the parties intended to form covenants running with the land. (ECF No. 50 at 58). However, Maverick had the right under the Development Agreement to pay a default fee instead of drilling a well.

It is a well-settled rule of Texas law that injunctive relief is generally available to enforce real property covenants. *See Gigowski v. Russell*, 718 S.W.2d 16, 21 (Tex. App. 1986). Occidental's inability to seek non-monetary damages reveals the personal nature of the Development Agreement. Although the Development Agreement requires Maverick to perform an act—drilling and equipping wells—which touches and concerns the Comanche Assets, Occidental cannot hold Maverick's feet to the fire if Maverick decides not to drill. Occidental may only receive monetary relief. Thus, even though Maverick's promise to drill and equip sixty wells per year would impact Maverick's use of the Comanche Leases, the remedy under the Development Agreement gives Maverick the option to completely bypass the promises affecting its real property.

The Development Agreement expressly states that it is intended to form covenants running with the land. However, by prescribing a purely monetary remedy, the parties undercut that expression of intent. *In re Chesapeake Energy*, 622 B.R. at 282. Occidental cannot show that the obligations under the Development Agreement run with the land when the Agreement does not actually *require* an act upon the land and the Agreement precludes land-based equitable remedies. While the obligation to drill touches and concerns the Comanche Leases, that obligation, practically speaking, is an option. Because the touch and concern element is only satisfied if

Maverick elects to drill, and the default fee shows the parties did not truly intend to form a real property covenant, the Drilling Agreement did not form a real property covenant under Texas law.

Statements of intent in an agreement are not dispositive of actual intent to form a covenant running with the land. *Id.* When the only remedy is a monetary remedy, the stated intent will not be honored. *Id.*

Finally, Occidental has not pointed to any other rights conveyed by the Development Agreement that might survive rejection consistent with *Mission Product*. The Court's review of the Agreement likewise revealed no such right. Thus, rejection of the Development Agreement relieves Mesquite and Maverick of the drilling commitment and the obligation to pay any default fees.

**CONCLUSION**

A separate order will be entered.

SIGNED 05/06/2021

Marvin Isgur
United States Bankruptcy Judge
